

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-30-1997

# Hamilton v. Leavy

Precedential or Non-Precedential:

Docket 95-7309

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

## Recommended Citation

"Hamilton v. Leavy" (1997). *1997 Decisions.* Paper 143.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/143

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 30, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 95-7309

JEROME K. HAMILTON,
Appellant,

v.

FAITH LEAVY; PAMELA FAULKNER; WILLIAM QUEENER;
FRANCES LEWIS

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

(D.C. Civil No. 94-cv-00336)

Submitted Under Third Circuit LAR 34.1(a)
January 23, 1997

Before: NYGAARD and LEWIS, Circuit Judges and
COHILL,* District Judge.

(Filed June 30, 1997)

_____

*Honorable Maurice B. Cohill, United States District Judge for the
Western District of Pennsylvania, sitting by designation.

Justin K. Miller
Toll, Ebby, Langer & Marvin
Two Logan Square, 18th Floor
Philadelphia, PA 19103

 Attorney for Appellant

Wendy A. Rising
Department of Justice
820 North French Street
Wilmington, DE 18901

 Attorney for Appellees

**OPINION OF THE COURT**

LEWIS, Circuit Judge.

Jerome K. Hamilton appeals from a district court order granting a motion to dismiss his civil suit, litigated pro se. Hamilton brought suit pursuant to 42 U.S.C. § 1983 against Faith Levy, Pamela Faulkner, William Queener, members of the Multi-Disciplinary Team at the Gander Hill prison facility in Wilmington, Delaware (the "MDT defendants"), and Frances Lewis, chairperson of the Delaware Department of Corrections Central Institutional Classification Committee ("CICC"). He alleges that the appellees violated his right to be free from cruel and unusual punishment, guaranteed by the Eighth Amendment to the United States Constitution. Specifically, Hamilton claims that these defendants knew of and disregarded an excessive risk to his safety posed by other inmates.

This case requires us to determine whether the district court misapplied the Supreme Court's decision in Farmer v. Brennan, 114 S. Ct. 1970 (1994), in which the Court announced the guidelines for determining "deliberate indifference" on the part of prison officials for purposes of Eighth Amendment claims. We must also determine whether the district court erred when it declined to allow Hamilton to pursue discovery, denied his request for the

2

appointment of counsel and refused to permit him to amend his complaint to add new defendants.

For the reasons explained below, we will reverse.

I.

Hamilton has a long history of being assaulted throughout the Delaware prison system. He has been transferred out of the State of Delaware twice, and has been placed in protective custody on numerous occasions. While an explanation for each of Hamilton's violent clashes throughout the prison system is absent from the record, the fact that Hamilton's safety has been an ongoing concern is not in dispute.

The earliest evidence of violence against Hamilton dates back to February 14, 1976. On that day he was stabbed by a fellow inmate while incarcerated in the Maximum Security Unit ("MSU") at the Delaware Correctional Center in Smyrna, Delaware ("DCC"). Over a year later, on May 8, 1977, an inmate attacked Hamilton with a chair in the MSU. On August 1, 1977, he was assaulted in the MSU by twenty inmates who stabbed him in the back, stomach and arms. He also suffered severe lacerations to the head and face, which required his hospitalization at the Institution Hospital at Gander Hill. For his own protection, Hamilton remained confined there for four months with no outside activities whatsoever. During that time, Hamilton made an effort to return to the MSU, but due to threats by other inmates, he was placed in protective custody pursuant to the "Inmates Rule (31) Emergency Provisions" procedure. Appellant's app. at 44a. Hamilton was later transferred out of the Delaware state prison system entirely and was held in federal custody in Leavenworth, Kansas. The stated reasons for Hamilton's transfer were to alleviate overcrowding and because "[Hamilton] had been assaulted and stabbed at the DCC and the staff feared for his safety." Id. at 27a.

At some point between 1982 and 1984, Hamilton was returned from federal custody to the custody of the State of Delaware, where he was again incarcerated at Gander Hill. The assaults continued. On March 25, 1985, he was

3

transferred to the general prison population at Sussex Correctional Institution in Georgetown, Delaware. There, he eventually notified officials that his "life was in danger" and that he would "be killed" if he remained there. Prison officials believed him. The following week, they recommended that he be placed in protective custody back at Gander Hill. Hamilton was later transferred, on April 11, 1986, from Gander Hill to DCC. Hamilton was informed that the reason for his transfer was that "it [was] felt that [he] may be in danger of physical harm should [he] continue to be housed [at Gander Hill]." Id. at 17a. In a document prepared by a member of the MDT, it was explained that "[Hamilton] was moved because he required protective custody in a more secure setting in that his life was in danger at [Gander Hill]." Id. at 47a. On May 21, 1986, Hamilton was placed in protective custody at DCC.

For reasons not apparent from the record, and despite the serious concerns described above, Hamilton was again returned to Gander Hill at some point in 1986. At that time, Hamilton cooperated with an official investigation of drug trafficking that led to the arrest of officers and inmates at Gander Hill. Not surprisingly, Hamilton was then labeled "a snitch" within certain circles of the prison population. Id. at 10a. This latest development required numerous transfers of Hamilton into protective custody. Frances Lewis, CICC Chairperson, personally approved transfers on November 16, 1988 and February 8, 1989, and Hamilton was recommended for protective custody again on May 11, 1989. Even up until November 30, 1989, the MDT acknowledged that Hamilton's need for protective custody had not changed. In fact, while Hamilton was still in protective custody at Gander Hill, the MDT recommended on August 17, 1990, that he be transferred "out of the building" to protective custody at another location. Id. at 29a. Because there appeared to be no safe place for Hamilton in the Delaware prisons, on September 4, 1990, prison officials decided that Hamilton would be transferred to Virginia to ensure his safety. Id. at 18a.

On December 12, 1991, Hamilton was temporarily returned from Virginia to Gander Hill for the purpose of prosecuting two civil actions in the Delaware courts, one of

4

which was an action against Delaware prison officials. Concern for Hamilton's safety was again triggered, when, on March 25, 1992, in a room at Gander Hill with several inmates present, a guard called Hamilton "a good telling mother f_____g snitcher." Id. at 25a. A committee appointed to investigate this incident, apparently recognizing the risk to Hamilton's safety, concluded that "comments of this nature [have] the potential of a major disturbance and requires immediate action." Id. at 24a. The guard who made the statement was later reprimanded.

On June 18, 1992, Levy, Faulkner and Queener convened a MDT meeting at Gander Hill to review Hamilton's security classification and consider his request to be placed in protective custody. The MDT made an administrative summary of the reasons for Hamilton's earlier transfer to Virginia and for his return to Delaware. After reviewing Hamilton's history of being assaulted in prison, the MDT unanimously recommended that Hamilton be placed in protective custody. But despite their own recommendation, the MDT took no immediate action to protect Hamilton. The MDT's report and recommendation were forwarded to the CICC, chaired by Lewis. The CICC thereafter made a unanimous determination to take "no action."

Consequently, Hamilton remained in the general population. Less than two months following the CICC's "no action" determination, on August 5, 1992, Hamilton was assaulted by another prisoner. The prisoner who pleaded guilty to the assault stated that he committed the offense because Hamilton was "a snitcher on inmates and officers at [Gander Hill]." Appellant's br. at 22. As a result of the assault, Hamilton required surgery to repair two jaw fractures and currently has two metal plates in his both sides of his jaw.

Hamilton thereafter filed suit in district court, claiming that prison officials violated state prison regulations and showed a deliberate indifference to his safety, thereby violating his constitutional right under the Eighth Amendment to be free from cruel and unusual punishment.

5

II.

The district court granted summary judgment in favor of the MDT defendants on the ground that they recommended that Hamilton be placed in protective custody, and were without authority to effectuate that recommendation. The district court also granted summary judgment in Lewis's favor on the ground that the facts did not establish that she was aware of the risk to Hamilton, and that a reasonable factfinder could not find otherwise. This appeal followed.

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1342. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's order granting summary judgment. Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 76 (3d Cir. 1990)."[W]e apply the same test as the district court should have used initially," id. at 76, to determine if there are any remaining issues of material fact that would enable Hamilton to prevail after giving him the benefit of every favorable inference that can be drawn from the record. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

III.

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners against the "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 219 (1986) (internal quotation marks omitted). This constitutional limitation on punishment has been interpreted to impose a duty upon prison officials to take reasonable measures " `to protect prisoners from violence at the hands of other prisoners.' " Farmer v. Brennan, 114 S. Ct. 1970, 1976 (1994) (quoting Cortes-Quinones v. Jimeniz-Nettleship, 842 F.2d 556, 558 (1st Cir. 1988)). While "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for a victim's safety," "[b]eing violently assaulted in prison is simply not `part of the penalty that criminal offenders pay for their offenses against society.' " Farmer, 114 S. Ct. at

6

1977 (quoting Rhodes v. Chapman, 45 U.S. 337, 345 (1981)). Accordingly, "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Id., at 1974.

For an inmate to prevail on an Eighth Amendment failure-to-protect claim, two requirements must be met. First, the prisoner must demonstrate "that he is incarcerated under conditions posing a substantial risk of serious harm." Id. at 1977. This element is satisfied when the alleged "punishment" is "objectively sufficiently serious." Id. Second, the prison officials involved must have a sufficiently culpable state of mind. Id. at 1979 ("[O]ur cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment."). Specifically, the inmate must show that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." Id.

Consequently, to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation. LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993).

IV.

A.

In its grant of summary judgment in favor of Lewis, the district court found "no credible evidence of record that [Hamilton] faced a substantial risk of serious harm from any inmate during his temporary classification to the general population [at Gander Hill], or that [Lewis] had knowledge of such so as to justify characterizing her June 24, 1992 classification decision as the infliction of punishment." Dist. ct. op. at 7.

In reaching this conclusion, the district court relied primarily on Lewis's affidavit in which she explains her

7

refusal to place Hamilton in protective custody despite the MDT's recommendation to provide him with such protection. She claimed that "Hamilton was kept at [Gander Hill] because there was no evidence of a problem there." She further commented that "[i]f valid evidence of a danger to plaintiff existed at [Gander Hill], the Committee would have classified him appropriately." The district court considered Lewis's affidavit conclusive in determining that no material issues of fact existed for resolution at trial. Our review of the record brings us to the opposite conclusion.

The district court erred in failing to acknowledge the MDT's recommendation that Hamilton should be placed in protective custody as evidence that he faced a substantial risk of serious harm. The MDT members, on June 18, 1992, considered Hamilton's history of violent clashes throughout the Delaware prison system, and acknowledged his statement that "protective custody concerns exist throughout the state."[1] The MDT members then concluded, unanimously, that Hamilton was in such danger as to justify isolating him from the general population in protective custody. Because there is no indication in the record that the MDT's recommendation was unwarranted or one-sided, we see no basis for the district court's conclusion that there was no evidence that Hamilton faced a substantial risk of serious harm.

---

1. The district court concluded that Hamilton failed to initiate the classification review proceeding in June, 1992, and that this militated against a finding of deliberate indifference on the part of Lewis. However, the MDT Memorandum reveals that Hamilton did "claim that the protective custody concerns still exist throughout the state." Appellant's app. at 11a. We note that the district court's reasoning suggesting that Hamilton was required to give advance notice of his safety concerns is inconsistent with the teachings of Farmer. There, while the plaintiff voiced no concern about his placement in the general population where he was assaulted, this fact was insufficient to support a grant of summary judgment for the defendants. Farmer, 114 S. Ct. at 1984-85 ("[T]he District Court may have mistakenly thought that advance notice was a necessary element of an Eighth Amendment claim. . . ."). Accordingly, in this case, the question of who initiated the June 18, 1992 classification review will have no bearing on the question of Lewis's awareness of the risk posed to Hamilton.

8

Yet, a showing that there was an excessive risk to Hamilton's safety is alone insufficient to preclude summary judgment. Hamilton must also show that the harm he suffered was caused by a prison official's deliberate indifference to his safety. Deliberate indifference can be shown when "a prison official knows of and disregards an excessive risk to inmate health or safety." Farmer, 114 S. Ct. at 1979. We are therefore required to "focus[on] what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be)." Id. at 1980. The Court believed this subjective approach to be appropriate because it "isolates those who inflict punishment." Id.

In this case, Lewis was made aware of a substantial risk to Hamilton's safety when she reviewed the MDT's unanimous recommendation to place Hamilton in protective custody. Lewis never suggested that she was not in possession of the MDT recommendation or that the recommendation was baseless. Indeed, it could be argued that Lewis had good reason to believe that the MDT's fears were well-founded since Lewis herself approved Hamilton for protective custody on two prior occasions. Moreover, since Lewis should be charged with knowledge of Hamilton's known cooperation with prison officials and the subsequent branding of Hamilton as a "snitch," appellant's app. at 47a, a factfinder could infer that Lewis knew that the threat to Hamilton's safety was imminent.

A prison official's knowledge of a substantial risk is a question of fact and can, of course, be proved by circumstantial evidence. Id. ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ."); see Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995) (existence of circumstantial evidence that prison officials were aware of risk posed to prisoner by asbestos precluded summary judgment). The Farmer Court explained in hypothetical terms the type of circumstantial evidence sufficient for a finding of actual knowledge on the part of a prison official:

9

if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was `longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,' and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus `must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Farmer, 114 S. Ct. at 1981-82.

The circumstantial evidence of record in this case, which is essentially identical to those hypothesized by the Farmer Court, does not appear to have been considered by the district court. However, these facts constitute sufficient circumstantial evidence upon which a factfinder could conclude that Lewis "must have known" of the risk to Hamilton's safety. Id. See id. at 1981 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."). Accordingly, based on the circumstantial evidence offered by Hamilton which demonstrates the existence of an obvious risk, Lewis's decision to consciously disregard that risk (memorialized by the CICC "no action" decision), and Hamilton's resulting injuries which occurred less than two months following the CICC's decision to take "no action," we conclude that summary judgment was improper as to Lewis.

B.

Moreover, the record indicates that the MDT defendants took no immediate action following its recommendation to the CICC that Hamilton should be placed in protective custody. It also took no action after that recommendation was rejected. The district court found that Hamilton's Eighth Amendment claim could not be maintained against the MDT defendants. It reasoned that because the MDT defendants were without authority to effectuate their own recommendation that Hamilton be placed in protective custody, they could not be found to have deliberately

10

disregarded serious risks to his safety. In other words, the court found that the MDT's submission of the report to Lewis amounted to a reasonable response to the risk Hamilton faced, which would preclude liability against them.

The Farmer Court specifically noted that"prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 1982-83. If a prison official responds reasonably to a risk to an inmate's safety, he or she cannot be found to have acted with a sufficiently culpable state of mind. Id. at 1983 ("Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."); id. ("A prison official's duty under the Eighth Amendment is to ensure `reasonable safety.' ") (quoting Hellig v. McKinney, 509 U.S. 25, 33 (1993)). Here, while it appears that the MDT defendants acted reasonably in following the internal prison procedures by recommending to the CICC that Hamilton be placed in protective custody, the reasonableness of their actions following the rejection of that recommendation remains a question.

The MDT defendants stated in their affidavits that they "did everything they could" with respect to ensuring Hamilton's safety when they recommended he be placed in protective custody. But the district court's refusal to consider whether the MDT defendants could have taken further action failed to give Hamilton the benefit of all reasonable inferences, to which he is entitled, as the non-movant. Indeed, Hamilton's counter-argument, asserted in his pro se complaint, is that the MDT defendants could have taken additional steps, such as place him in administrative segregation. Because neither party presented conclusive evidence on this issue, there remains a genuine issue of material fact regarding whether the MDT's response to the risk Hamilton faced was reasonable. Matshushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (to survive summary judgment, non-movant must only show more than "some metaphysical

11

doubt as to the material facts"); Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact [the] opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the `mere scintilla' threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent . . . ."); Ely v. Hall's Motor Transit Co., 590 F.2d 62 (3d Cir. 1978) (any doubts as to the existence of a genuine issue of material fact will be resolved against the movant). The failure of the MDT defendants to take additional steps beyond the recommendation of protective custody could be viewed by a factfinder as the sort of deliberate indifference to inmate safety that the Constitution forbids.

Accordingly, we will reverse the district court's grant of summary judgment in favor of the MDT defendants.

V.

Hamilton also alleges that the district court erred by denying his request for the appointment of counsel. In denying Hamilton's request, the district court considered the factors we announced in Tabron v. Grace, 6 F.3d 147, 155-56 (3d Cir. 1993), for determining whether the appointment of counsel is warranted. We review the district court's refusal to appoint counsel to Hamilton for abuse of discretion. Id. at 155 n.4.

In Tabron we held that when deciding whether to appoint counsel for indigent litigants, district courts should consider the merits of the plaintiff's claim, the plaintiff's ability to present his or her case, the difficulty of the legal issues, and the degree to which the case will require extensive factual investigation or turn on credibility determinations. Id. at 156.

After weighing the various Tabron factors, the district court concluded that Hamilton could not demonstrate "special circumstances indicat[ing] the likelihood of substantial prejudice to him resulting . . . from his probable inability without such assistance to present the facts and legal issues to the court in a complex but arguably

12

meritorious case." Smith-Bey v. Petsock, 741 F.2d 22, 26 (3d Cir. 1984).

We are unable to agree with this conclusion for two reasons: first, the district court erred in concluding that Hamilton did not have a colorable claim; second, the record indicates that Hamilton may be ill-equipped to represent himself or to litigate this claim inasmuch as there is unrebutted medical evidence that he suffers from a paranoid delusional disorder. The district court's failure to consider the weight of this fact demonstrates that more serious consideration should have been given to Hamilton's request for the appointment of counsel. We will therefore reverse on this issue and remand to the district court with instructions to appoint counsel for Hamilton. See Tucker v. Randall, 948 F.2d 388, 391 (7th Cir. 1991) (appointment of counsel appropriate when plaintiff presented colorable claim of deliberate indifference to serious medical needs resulting in permanent deformities).

VI.

We do not believe that Hamilton's request for additional discovery and for leave to amend his complaint require extended discussion. The district court denied these requests on the ground that each was a futile attempt to salvage Hamilton's action under 42 U.S.C. § 1983. As we have explained above, the district court misconstrued Farmer, and Hamilton does have a colorable Eighth Amendment claim. We will, therefore, remand this issue to the district court with instructions to permit Hamilton to pursue full and reasonable discovery as is consistent with the Farmer mandate relating to circumstantial evidence, as described above. Because Hamilton's initial discovery request involved an effort to obtain the names of those officials who were aware of the substantial risk to his safety, and that request was erroneously denied, it is appropriate that Hamilton be allowed to amend his complaint as well.2 Small v. Lehman, 98 F.3d 762 (3d Cir.

_____

2. Our reversal in this matter renders it unnecessary to reach Hamilton's contention that the district court improperly converted appellees' motion to dismiss pursuant to Rule 12(b)(6) to one of summary judgment.

1996) (courts should allow liberal amendment of pro se complaints).

VII.

For the foregoing reasons, we will reverse the district court's order of November 2, 1994, granting summary judgment to the MDT defendants. We will also reverse the district court's order of May 26, 1995, granting summary judgment to Lewis, and remand this case with instructions to appoint counsel for Hamilton,3 to permit him to undertake discovery and to permit him to amend his complaint.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

3. Judge Nygaard would not directly appoint counsel, but, believing that the issue is best addressed by the district court in the first instance, would remand the question for that court to exercise its discretion, as required by Tabron v. Grace, 6 F.3d 147, 158 (3d Cir. 1993).

14