

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-11-2001

# Beers-Capitol v. Whetzel

Precedential or Non-Precedential:

Docket 00-2479

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Beers-Capitol v. Whetzel" (2001). *2001 Decisions.* Paper 126.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/126

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 11, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2479

AMIE MARIE BEERS-CAPITOL;
ALIYA TATE, Appellants

v.

BARRY WHETZEL, an individual; SHIRLEY ROBINSON, in
her official capacity; ROBERT LIGGETT , in his individual
and official capacity; YOUTH DEVELOPMENT CENTER AT
NEW CASTLE; NORA BURLEY, in her individual and
official capacity; NICK PIHIOU, in his individual and
official capacity; JOHN DOE, in his/her individual and
official capacity; CHARLES LEE EARNHAR T, in his
individual and official capacity; JOSEPH FLECHER, in his
individual and official capacity
(D.C. Civil No. 97-cv-00292)


ALIYA TATE

v.

BARRY WHETZEL, in his individual capacity; SHIRLEY
ROBINSON, in her individual and official capacity;
ROBERT LIGGETT, in his individual and official capacity;
YOUTH DEVELOPMENT CENTER AT NEW CASTLE; JOHN
DOE, in his/her individual and official capacity, NORA
BURLEY, in her individual and official capacity; NICK
PIHIOU, in his individual and official capacity
(D.C. Civil No. 97-cv-00313)

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. No. 97-cv-00292)
District Judge: Honorable Gary L. Lancaster




Argued: February 5, 2001

Before: BECKER, Chief Judge, AMBRO and
STAPLETON, Circuit Judges.

(Filed: June 11, 2001)

        BARBARA M. WOLVOVITZ,
         ESQUIRE (ARGUED)

GARY M. LANG, ESQUIRE
Feldstein, Grinberg, Stein &
 McKee, P.C.
428 Boulevard of the Allies
Pittsburgh, PA 15219

Counsel for Appellants

D. MICHAEL FISHER, ESQUIRE
Attorney General
HOWARD G. HOPKIRK, ESQUIRE
 (ARGUED)
Deputy Attorney General
CALVIN R. KOONS, ESQUIRE
Senior Deputy Attorney General
JOHN G. KNORR, III
Chief Deputy Attorney General
Chief, Appellate Litigation Section
Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

Plaintiffs Amie Marie Beers-Capitol and Aliya Tate, two female former residents at the Youth Development Center at New Castle, Pennsylvania (YDC), a detention facility for juveniles run by the Pennsylvania Department of Public Welfare, appeal from the District Court's grant of summary

judgment against them in this 42 U.S.C. S 1983 civil rights lawsuit that they brought against various YDC employees and supervisors. During their time at YDC, the plaintiffs were sexually assaulted by Barry Whetzel, a YDC employee who was working as a youth development aide at the time he committed the assaults. Whetzel was eventually convicted of criminal charges arising out of these incidents. Beers-Capitol and Tate then brought a civil rights action alleging violations of their Eighth Amendment rights and naming as defendants: Whetzel; three of his supervisors, Robert Liggett, the Executive Director of YDC, Charles Earnhart, a YDC director, and Joseph Flecher, a YDC manager; and two of his co-workers, Nora Burley, a YDC counselor, and Shirley Robinson, a YDC youth development aide. After the District Court granted summary judgment in favor of all of the other defendants, the plaintif fs won a

judgment of $200,000 against Whetzel.

An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of`deliberate indifference' to inmate health or safety." Id. "Deliberate indifference" is a subjective standar d under Farmer--the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety. The parties agree that the sexual assaults against Beers-Capitol and Tate were sufficiently serious, so the determinative issue in this case is whether the defendants' actions and inaction rose to the level of deliberate indiffer ence. Depending on the roles and responsibilities of the r espective defendants, the plaintiffs have set forth two bases for their claims of deliberate indifference. With r espect to the defendants who are alleged to have had notice that Whetzel was having sex with one or more of the female residents at YDC, the plaintiffs assert that these defendants took inadequate (or no) measures in response to this notice. W ith respect to the defendants who are not alleged to have had knowledge of the specific risk that Whetzel posed, the plaintif fs claim that these defendants either implemented or failed to

3

implement YDC policies that created a situation in which an employee like Whetzel would be able to sexually assault female residents at YDC without being discover ed for some time, and that these defendants were awar e that such policies created this risk but ignored it.

We will affirm the District Court's grant of summary judgment for defendants Liggett, Earnhart, Flecher, and Robinson, because the evidence that the plaintif fs proffer against these defendants fails to raise an infer ence that these defendants actually knew or were awar e of the significant risk of harm to the plaintif fs. However, we will reverse the grant of summary judgment for defendant Burley, because the plaintiffs have pr esented evidence that Burley told one of the plaintiffs that she"kind of knew" that Whetzel was "messing" with the female r esidents at YDC. This evidence, along with Burley's admission in her deposition that she heard numerous rumors that Whetzel was having sex with the female residents, is sufficient to raise a genuine issue of fact as to whether Burley was aware of the significant risk that Whetzel posed to the plaintiffs but did not adequately respond to this risk.1

I. Facts and Procedural History

YDC is a Pennsylvania Department of Public W elfare institution that houses adjudicated delinquent juvenile offenders, both male and female; the female r esidents range in age between 13 and 21 years and come from all areas of the state. YDC is divided into several "Units," and each of these Units is itself divided into several "cottages." Beers–Capitol and Tate were housed in Unit 7, which contained the female residents. Unit 7 is comprised of three cottages: 7A, 7B, and 7C.

_____

1. The defendants also raise a defense of qualified immunity. This issue was not reached by the District Court (because it granted summary judgment on the merits). With regar d to the defendants for whom we will affirm summary judgment, we need not decide the issue of qualified immunity. With regard to the defendant for whom we will reverse summary judgment, her acts of deliberate indif ference to an excessive risk to the plaintiffs foreclose her claim of qualified immunity. See infra note 15.

4

Defendant Robert Liggett is the Executive Dir ector of YDC; as such he has ultimate responsibility for the overall operation of YDC. His duties include managing YDC's daily operation, supervising and training the staf f, and formulating and implementing all operational policies, regulations, and practices. Defendant Charles Lee Earnhart was the unit director for Units 7 and 8 during the relevant time period. Earnhart was responsible for the day–to–day operations of Unit 7, including the supervision of the staff of the unit, and the review and evaluation of staff reports and scheduled work. Liggett directly supervised Earnhart, who in turn directly supervised the unit managers, meeting with these managers daily. Defendant Joseph Flecher was the unit manager for Unit 7 during the relevant time period. Unit managers are responsible for developing, coordinating, and administering program services for their unit; they also directly supervise the cottage supervisors within their unit. Cottage supervisors directly supervise counselors, youth development aides, and other staff in their cottages (no cottage supervisor is a defendant in this case). Defendant Nora Burley was a counselor who worked in Unit 7, and defendant Shirley Robinson was a youth development aide in Unit 7. Counselors provide security in the units and monitor resident interactions, and youth development aides perform a similar role. Whetzel was also a youth development aide in Unit 7.

New staff members at YDC receive two weeks of training on YDC policies. Because the residents incar cerated at YDC often have previously suffered sexual abuse and have become sexually active at an early age, this training includes instruction on how to identify and appr opriately handle cases of sexual victimization and abuse, and how to deal with female residents who express sexual interest in staff members. The staff are taught that the YDC residents are likely to express attraction to them and to approach them in a sexual manner, and that any sexual relations with residents are unethical and absolutely forbidden. Alice Peoples, the Training Manager at YDC, testified that YDC employees are taught that children who ar e sexually abused often afterwards deny that the abuse occurred. Peoples also stated that she informs YDC employees at their training that they are legally responsible to report any

5

allegations of abuse, and that failure to r eport such allegations could result in them being char ged with abuse themselves.

YDC is subject to 23 Pa. Cons. Stat. S 6311, a Pennsylvania state law on child abuse reporting which provides that any staff member of a facility like YDC who receives an allegation of abuse or otherwise becomes aware of such abuse must notify the person in char ge of the facility (in this case, Executive Director Liggett).2 Earnhart testified that there is no discretion for YDC employees under this law; notification of any allegation of or information about abuse must go to Liggett. Liggett is then responsible for initiating an investigation into the alleged abuse. Part of the process of such an investigation includes

_____

2. Title 23 Pa. Cons. Stat. S 6311 pr ovides in pertinent part:

    S 6311. Persons required to r eport suspected child abuse

      (a) General rule.--Persons who, in the course of their employment, occupation or practice of their profession, come into contact with children shall report or cause a r eport to be made in accordance with section 6313 (relating to reporting procedure) when they have reasonable cause to suspect, on the basis of their medical, professional or other training and experience, that a child coming before them in their professional or official capacity is an abused child. . . .

      (b) Enumeration of persons required to report.--Persons required

to report under subsection (a) include, but ar e not limited to,
any
. . . school administrator, school teacher , school nurse, social
services worker, day-care center worker or any other child-care or
foster-care worker, mental health professional, peace officer or
law
enforcement official.

(c) Staff members of institutions, etc.--Whenever a person is
required to report under subsection (b) in the capacity as a member
of the staff of a medical or other public or private institution,
school,
facility or agency, that person shall immediately notify the person
in
charge of the institution, school, facility or agency or the
designated
agent of the person in charge. Upon notification, the person in
charge or the designated agent, if any, shall assume the
responsibility and have the legal obligation to report or cause a
report to be made in accordance with section 6313. This chapter
does not require more than one r eport from any such institution,
school, facility or agency.

6

sending notification of the alleged abuse within 24 hours to
Child Line, a hotline for child abuse allegations. 3

Because this is an appeal of a grant of summary
judgment, we must review the facts in the light most
favorable to the party against whom summary judgment
was entered. See Pi Lambda Phi Frater nity, Inc. v. University
of Pittsburgh, 229 F.3d 435, 441 n.3 (3d Cir. 2000). We
therefore accept as true for the purposes of this appeal the
plaintiffs' description of: (1) the abuse they suffered at YDC;
(2) relevant abuse suffered by other residents; and (3) the
actions and reactions of YDC staff when they were notified
of such abuse.

A. The Abuse Suffered by Beers-Capitol

Beers-Capitol was 17 years old when she was
incarcerated at YDC New Castle from February 3, 1994 to
March 30, 1994. Whetzel started making sexual comments
to Beers-Capitol a few weeks after she arrived. This
escalated into Whetzel inappropriately touching Beers-
Capitol in various public places at YDC. Whetzel then
began waking Beers-Capitol up in the middle of the night to
bring her into his office to molest her and ask her to have
sex with him. When she refused, he took away her
privileges. Beers-Capitol eventually had sex with Whetzel
about a week or so before she was released, and she then

_____

3. Notwithstanding this training, there is evidence in the record that YDC employees viewed claims made by residents with skepticism. Michael Pogozelec, a counselor at YDC who is not a party in this case, testified in his deposition that

> kids there [at YDC] are extr emely manipulative. When they come in, they're used to getting their way any way they can out there on the streets. . . . [A]ll of them came fr om homes that were highly dysfunctional where they had to survive themselves either by scheming, manipulating, intimidating, game-playing. So, staff question things right off the bat. They don't believe everything that
> a student brings to their attention.

That this attitude was widespread at YDC is supported by a comment defendant Flecher made to Robert McLean, an investigator hired by Liggett to look into allegations of abuse by Whetzel. Flecher told McLean that "these types of accusations [of sexual abuse] occur on a frequent basis when female students become angry or upset with staff members."

7

came to the conclusion that he had gotten her pr egnant. On the day before she was released fr om YDC, Beers–Capitol was cleaning the unit's canteen with defendant Shirley Robinson; at that time, she told Robinson that she had had sex with Whetzel and that she believed Whetzel had gotten her pregnant. Robinson did not believe that Beers–Capitol was serious in her allegation and r esponded by saying, "Well, you know that you can get in trouble making accusations like that."

In her deposition, Robinson stated that, although originally she did not believe Beers–Capitol's allegation, the accusation "nagged" her because she knew that any allegation had to be reported. She thus r eported the accusation to Earnhart the next day and wr ote up an incident report. According to Robinson's deposition, the following day Earnhart called Beers–Capitol, who had been released by then, at her home in Erie, Pennsylvania, to check on the story, whereupon Beers–Capitol denied the accusation. However, according to Ear nhart's deposition, Robinson delayed for a longer period, possibly up to three weeks, before informing Earnhart of the allegation, and at that point Earnhart asked defendant Flecher to call Beers–Capitol at home about the allegation, and Flecher did so at that time.4 Beers–Capitol testified that someone from YDC called her at some point after her release and asked, "Amie, we have accusations we know Barry did not do. I need to ask you, did you have sex with him?" Beers–Capitol denied

having sex with Whetzel.

Robinson, Earnhart, and Flecher did not r eport Beers-Capitol's allegation to Liggett as requir ed by 23 Pa. Cons. Stat. S 6311. Earnhart did check with the Medical Department and was informed that Beers-Capitol had had

_____

4. Earnhart's testimony on this issue is somewhat confused. His first response was that he did not think Robinson delayed three weeks in reporting the allegation to him, but when confr onted with the fact that Flecher's file notes show that the phone call to Beers-Capitol was made three weeks after Beers-Capitol made her allegation, he seems to imply that Robinson did in fact delay her report of the allegation for three weeks. Beers-Capitol's deposition is unclear as to who called her and when, except that the caller was a male YDC employee and that the call was shortly after her release.

a pregnancy test on March 21, and that the results of the test were negative. Of course, a negative pr egnancy test on March 21 is consistent with Whetzel impr egnating Beers-Capitol about a week or so before her r elease on March 30. According to her deposition, Beers-Capitol did not want her boyfriend at the time of her release (now her husband) to find out that Whetzel had impregnated her , so she had sex with her boyfriend soon following her release. Nine months later, she gave birth to a son, whom she and her husband have raised as their child. Although Beers-Capitol has never had a paternity test done, she seems to be convinced that Whetzel is her son's biological father.

B. The Abuse Suffered by T ate

Aliya Tate was incarcerated at YDC fr om June 13, 1991 through May 4, 1993 and from July 12, 1994 to March 28, 1995. In November 1994, when she was 16, Tate was in a counseling session with Whetzel in Whetzel's back office discussing Tate's past sexual abuse, wher eupon Whetzel began to rub Tate's leg and lower thigh. On several other occasions in November and December 1994 and January 1995 Whetzel attempted to kiss Tate and touch her genitals. On the night of December 12, Whetzel tried to touch Tate inappropriately while they wer e alone in Unit 7's TV room, but Tate immediately left the r oom. At around this time, two other students reported (falsely, according to Tate) that Tate and Whetzel had had sex in the TV room on December 12. This allegation was reported to Liggett, who assigned Robert McLean to investigate. Tate testified that Whetzel threatened that he would lengthen her stay at YDC if she told anyone what he had done, so Tate gave McLean

a sworn statement that nothing had occurr ed between her and Whetzel.

Finally, on January 29, 1995 Whetzel corner ed Tate in the back office at the unit, prevented her fr om leaving, grabbed her, kissed her, put his hands down her pants and then tried to pick her up and lick her chest. After this incident, Tate wrote up a Student Incident Report (SIR) complaining of Whetzel's behavior that evening along with the previous incidents and gave it to the duty officer. The duty officer then notified Earnhart of the allegation. The next day, Tate talked to Nora Burley about the previous

day's incident as well as all the past incidents with Whetzel, at which time, according to Tate's deposition, Burley said to her that "she kind of knew he was messing with students but she didn't know that he was messing with me."

As a result of Tate's filing of the SIR, Liggett instituted an investigation, and YDC notified Child Line. Child Line in turn notified the Pennsylvania State Police which initiated its own investigation into Whetzel's conduct, eventually resulting in Whetzel's criminal conviction. In the course of their investigation the police found two other for mer residents of YDC who had been sexually assaulted by Whetzel: Melissa Guyaux and Tina McAfee.

C. Relevant Abuse of Other Residents

Melissa Guyaux was at YDC from August 1992 to July 1993. Guyaux testified at Whetzel's criminal trial that she had had sex with Whetzel on many occasions during her time at YDC. Guyaux stated that Whetzel often came into her room in the middle of the night, took her to the canteen, and even took her out of school in the middle of the day to have sex with her. In March 1993 it came to Nora Burley's attention that another YDC resident alleged that Whetzel and Guyaux were having sex. Burley set up a meeting to investigate these allegations. Whetzel br ought Guyaux to the meeting and threatened her en r oute, saying that he would extend her stay at YDC if she said anything. Guyaux thus denied having sex with Whetzel at the meeting; Liggett was not notified of the allegation.

Tina McAfee was at YDC from May 1994 to February 1995. During this time, Whetzel counseled McAfee about her previous sexual abuse as a child. At one session, while McAffee was talking about past instances of rape and abuse, Whetzel asked her if it felt good and pointed to her vagina. Subsequently, Whetzel would wake McAfee in the

middle of the night to have sex with her. On a couple of
occasions, Flecher became aware of rumors that Whetzel
was having sex with McAfee (one of the times it was
Whetzel himself who approached Flecher, expressing
"concern" over these "rumors"). Flecher twice talked to
McAfee about these allegations, but she denied them both
times. Flecher never informed Liggett about the allegations.

10

Finally, during his investigation of the reports that Tate
and Whetzel had sex on Decemeber 12, 1994, investigator
Robert McLean learned from Flecher that another female
resident of YDC, Jochabed Good, had told a judge in mid-
1994 that "YDC was unsafe and `some staf f members at the
YDC are having sex with students.' " It is not clear from the
record when Flecher became aware of Good's allegation, or
what Flecher did in response.

D. Procedural History

The plaintiffs brought suit in the District Court for the
Western District of Pennsylvania under 42 U.S.C. S 1983,
alleging that they were subjected to cruel and unusual
punishment in violation of the Eighth Amendment of the
United States Constitution because they were sexually
assaulted by Whetzel while incarcerated at YDC. 5 All of the
defendants except Whetzel moved for summary judgment.
In deciding this motion, the District Court applied the two-
part test from Farmer v. Brennan, 511 U.S. 825 (1994), for
finding an Eighth Amendment violation by a prison official:
(1) a sufficiently serious constitutional deprivation; and (2)
deliberate indifference by the prison official-defendants.

As noted above, it is not disputed that the sexual abuse
suffered by the plaintiffs was sufficiently serious to support
an Eighth Amendment claim, so the key issue in the case
is whether the defendants exhibited deliberate indif ference
to the plaintiffs' health or safety. The District Court granted
the defendants' motion for summary judgment, concluding
that the plaintiffs had not "demonstrated a triable issue of
fact as to whether any of the moving defendants wer e
deliberately indifferent to a substantial risk to [the]
plaintiffs' rights." D. Ct. Mem. Op. at 8. This timely appeal
followed. The District Court had jurisdiction pursuant to 28
U.S.C. SS 1331 & 1343, and we have jurisdiction pursuant
_____

5. The plaintiffs also originally br ought claims under the Fourth, Ninth,
and Fourteenth Amendments. The District Court r ejected these claims
because it concluded that an Eighth Amendment analysis was the
proper one to use for claims arising fr om incarceration in a facility for

juvenile offenders. See Dist. Ct. Mem. Op. at 7. The plaintiffs do not press these other claims on appeal.

to 28 U.S.C. S 1291. We set forth the familiar standard of review of grants of summary judgment in the mar gin.6

II. Discussion

Because this case turns on the plaintif fs' claims of deliberate indifference, we begin our analysis with an examination of the Supreme Court and Thir d Circuit jurisprudence on deliberate indifference in the context of an Eighth Amendment prison conditions claim. We then apply this analytical structure to the plaintif fs' claims against each of the defendants.

A. The Law on Deliberate Indiffer ence in a Prison Conditions Case

1.

The leading Supreme Court case setting forth the Eighth Amendment deliberate indifference analysis for a prison conditions case is Farmer v. Brennan, 511 U.S. 825 (1994). In Farmer, the Supreme Court r eversed a grant of summary judgment for various defendant prison officials on the plaintiff 's Eighth Amendment claim, which was based on the deliberate indifference that the officials allegedly showed to his risk of being sexually assaulted in prison. In its analysis on what type of showing is needed to establish deliberate indifference by a defendant, Farmer rejected an objective test for deliberate indiffer ence; instead it looked to what the prison official actually knew rather than what a

_____

6. We exercise plenary review over a District Court's grant of summary judgment and review the facts in the light most favorable to the party against whom summary judgment was entered. See Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh, 229 F.3d 435, 441 n.3 (3d Cir. 2000). Summary judgment is proper if ther e is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See F.R.C.P. 56(c);Celotex Corp. v. Catrett, 477 U.S. 317 (1986). At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter , but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

reasonable official in his position should have known. More specifically, the Court held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." Id. at 837.

This requirement of actual knowledge means that "the official must both be aware of facts fr om which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the infer ence." Id. Farmer explained, however, that this subjective knowledge requirement does not mean that a prison official can avoid liability by remaining deliberately indif ferent to an excessive or substantial risk of serious harm to prisoners:

> We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates. Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

Id. at 842.

Moreover, a defendant's knowledge of a risk can be proved indirectly by circumstantial evidence. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (citing Wayne R. LaFave & Austin W. Scott, Jr ., Substantive Criminal Law S 3.7, p. 335 (1986) ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact r ealize it. . . .")). In fact, Farmer anticipated that a plaintiff could make out a deliberate indifference case by showing that prison officials simply were aware of a general risk to inmates in the plaintiff 's situation:

> [I]f an Eighth Amendment plaintiff pr esents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expr essly noted by prison officials in the past, and the

13

> circumstances suggest that the defendant-official being

sued had been exposed to information concer ning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

Id. at 842-43 (quotation marks and citation omitted). Similarly, Farmer made clear that a prison official defendant cannot escape liability by showing that he did not know that this particular inmate was in danger of attack: "it does not matter . . . whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Id. at 843.

Farmer emphasized further that, while a prison official's knowledge of an excessive risk of serious har m may be inferred from the fact that the risk is obvious, this inference is not compelled, as the official always must have an opportunity to show that he was unaware of the risk. See id. at 844. Finally, the official who is actually aware of the risk to the prisoner can avert liability by showing that he responded reasonably to the risk, even if the ultimate harm was not avoided. See id.

The Court in Farmer also discussed the showing that a plaintiff needs to make to survive a summary judgment motion on a deliberate indifference claim. Although this discussion was in the context of a claim for an injunction, it may be applied to a claim for damages. The Court stated that "to survive summary judgment, [the plaintiff] must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm." Id. at 846. We r ead this discussion in Farmer to mean that, to defeat the summary judgment motion, Beers-Capitol and Tate must present enough evidence to support the inference that the defendants "knowingly and unreasonably disregarded an objectively intolerable risk of harm."

Our decision in Hamilton v. Leavy, 117 F .3d 742 (3d Cir. 1997), is instructive because it applies Far mer's deliberate

14

indifference test to a situation somewhat similar to the case at bar. In Hamilton, a prisoner br ought an Eighth Amendment deliberate indifference claim against certain prison officials, alleging that the officials were deliberately indifferent to the risk to his safety posed by other inmates

when they transferred him to a certain Delawar e state prison. Plaintiff Hamilton had been attacked and seriously injured by other inmates at this prison. The court granted summary judgment for Lewis, the prison official who was in charge of prisoner transfers, on the basis of Lewis's affidavit that she did not know of any risk posed to Hamilton by the transfer. The district court granted summary judgment to the other defendants, who were members of the prison system's "Multi-Disciplinary Team" (MDT), because the court concluded that the MDT had acted reasonably and "did everything they could" after they lear ned of the risk to Hamilton (the MDT had recommended that Hamilton be placed in protective custody at the prison before he was attacked). Id. at 748. We reversed.

First, we noted that Hamilton had presented sufficient circumstantial evidence that Lewis was awar e of the risk posed to Hamilton to survive summary judgment: Lewis had probably received the MDT recommendation (she did not deny this); Lewis knew that Hamilton was a prison informant and thus was more likely to be harmed by other inmates; and Lewis herself had approved pr otective custody for Hamilton on two prior occasions. See id. at 747. We held that this proffered evidence was similar to the type of circumstantial evidence anticipated as sufficient by Farmer, i.e., it was sufficient evidence "upon which a factfinder could conclude that Lewis `must have known' of the risk to Hamilton's safety." Id. at 748 (quoting Farmer, 511 U.S. at 842). Second, we reversed the grant of summary judgment for the MDT defendants because Hamilton demonstrated that there was a genuine issue of fact as to whether these defendants could have done something more than merely offer a recommendation; for example, they could have placed Hamilton in administrative segregation. We thus held that "there remains a genuine issue of material fact regarding whether the MDT's response to the risk Hamilton faced was reasonable." Id.

15

From Farmer and Hamilton we extract the following precepts. To be liable on a deliberate indifference claim, a defendant prison official must both "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware. See id. at 837–38. However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must

have known of the risk. See id. at 842. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took r easonable steps to prevent the harm from occurring. See id. at 844.

2.

The plaintiffs' theory as to how the defendants' actions and inactions constitute deliberate indiffer ence proceeds along two basic lines. First, the plaintiffs contend that some of the defendants knew of the abuse committed by Whetzel or were aware of the high risk of abuse, but declined to act or to seek more information about it. Second, the plaintiffs also claim that the supervisor defendants, while per haps not aware of the particular risk that Whetzel posed to these specific plaintiffs, implemented policies that were so defective that they created an unreasonable and excessive risk of abuse to the female residents generally at YDC, and that the defendants were aware of this risk.

Both of these approaches depend upon the thesis that all of the defendants were trained experts in the area of juvenile detention, so that, given what they knew, they must have been aware of the excessive risks of harm to the plaintiffs that existed at YDC. In particular , the plaintiffs contend that those defendants who were r esponsible for implementing the policies at YDC had to know that the policies and procedures at YDC created substantial general risks of sexual abuse for the female residents there, as

16

these defendants were trained how to minimize those risks. The plaintiffs assert further that those defendants who worked directly with the female residents had to know of the particular risk that Whetzel posed because they were trained to recognize cases of sexual abuse and they were aware of persistent allegations of his sexual r elationships with the residents.

The deliberate indifference claims implicating supervisors for their deficient policies are more complicated than the other, more direct deliberate indif ference claims, because the former add another level to the analysis. Both the plaintiffs and the defendants argue that we should analyze the supervisor-centered claims under the four-part test for supervisor liability developed in Sample v. Diecks, 885 F.2d 1099 (3d Cir. 1989).7 Sample involved a claim that a supervisor was liable for a subordinate's Eighth Amendment violation because the supervisor implemented

deficient policies and was deliberately indif ferent to the risk these policies generated. Although the claim in Sample does not seem to be precisely the same as the plaintiffs' claim in the case at bar--Sample concerned whether a supervisor could be liable for a subordinate's Eighth Amendment tort while the plaintiffs here seem to claim that the supervisors committed their own Eighth Amendment violations by implementing defective policies--we do not think this difference material.

In Sample, the plaintiff (Sample) had his life sentence for murder vacated by the Pennsylvania Supr eme Court, and was granted bail pending the new trial. Although his family

_____

7. Although Sample was decided before Farmer, nothing in the Sample opinion that we rely on here conflicts with Farmer. Indeed, we have used parts of Sample's analysis of supervisor liability on a deliberate indifference claim in at least one case after Farmer. See Carter v. City of
Philadelphia, 181 F.3d 339, 356–357 & n.61 (3d Cir. 1999). District courts in this circuit have also applied the Sample four–part test for determining supervisor liability on deliberate indifference claims after Farmer. See, e.g., Andrews v. Camden County, 95 F. Supp. 2d 217, 228–29 (D.N.J. 2000); Burch v. Reeves, 1999 WL 1285815 at *2–*3 (E.D. Pa. Dec. 20, 1999); Carrigan v. Delaware, 957 F. Supp. 1376, 1382–83 (D. Del. 1997); Wagner v. Pennsylvania, 937 F. Supp. 510, 516 (W.D. Pa. 1995).

17

was ready to post bail, the senior recor ds officer (Diecks) determined that Sample still had time to serve on another sentence. In fact, Diecks was mistaken, and by the time this mistake was rectified, Sample had served an additional nine months. Sample sued Diecks and William Robinson, the Commissioner of the Pennsylvania Bureau of Corrections. Diecks was found liable for an Eighth Amendment violation for his deliberate indif ference. The apposite precedent concerns the question whether Robinson was liable on the Eighth Amendment claim, as Diecks' supervisor, for failing to pr operly supervise and implement policies and practices that would have pr otected against the constitutional violation.

Presented with these facts, we developed a four –part test, based on the Supreme Court's reasoning in City of Canton v. Harris, 489 U.S. 378 (1989), for supervisor liability on an Eighth Amendment claim for failure to pr operly supervise. Under this regime, to hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that

the supervisor failed to employ and show that: (1) the existing policy or practice created an unr easonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice. See Sample, 885 F .2d at 1118.

According to Sample, one way--per haps the easiest way-- a plaintiff can make out a supervisor liability claim is by showing that "the supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries." Id. But that is not the only way to make out such a claim, as "there are situations in which the risk of constitutionally cognizable harm is so gr eat and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unr easonable risk, and of indifference to it." Id.8

_____

8. Stoneking v. Bradford Area School District, 882 F.2d 720 (3d Cir. 1989), used a test similar to Sample's in considering a claim made under the second method of showing deliberate indif ference (existence of "so

In sum, to make out a claim of deliberate indif ference based on direct liability (i.e., insofar as the defendants are alleged to have known of and ignored the particular risk that Whetzel posed), the plaintiffs must meet the test from Farmer v. Brennan: They must show that the defendants knew or were aware of and disregar ded an excessive risk to the plaintiffs' health or safety, and they can show this by establishing that the risk was obvious. For the plaintiffs' claims seeking to hold supervisors liable for their deficient policies, Sample's four-part test pr ovides the analytical structure for determining whether the policymakers exhibited deliberate indifference to the plaintiffs' risk of injury, it being simply the deliberate indif ference test applied to the specific situation of a policymaker .

B. The Allegations Against the Defendants: Applying The Test

1. Robert Liggett, Executive Director of YDC

As the Executive Director of YDC, Liggett has ultimate responsibility for the overall operation of YDC. His duties include managing YDC's daily operation, supervising and training the staff, and formulating and implementing all operational policies, regulations, and practices. The plaintiffs concede that Liggett did not have actual

knowledge of Whetzel's abuse of the plaintif fs, nor of the specific risk that Whetzel posed to the plaintif fs, until after the fact. Instead, the plaintiffs level a claim of supervisor liability against Liggett, contending that the policies and

_____

great and so obvious" a risk). In Stoneking, the plaintiff, a student in the
Bradford school district, sought to hold the school district and its officials liable for a teacher's sexual assault on her, on the theory that the school district and officials maintained a practice, custom, or policy of deliberate indifference to instances of known or suspected sexual abuse by teachers. Stoneking, like Sample, followed the reasoning of City of Canton, and held that "if the need for mor e or different training is so
obvious, and the inadequacy so likely to result in the violation of constitutional rights, `the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.' " Id. at 725 (quoting City
of Canton v. Harris, 489 U.S. 378, 390 (1989)).

19

procedures that Liggett implemented and approved created an unreasonably unsafe environment at YDC that allowed Whetzel to commit his abuse over an extended period, and that Liggett knew that his policies were deficient in this way.

The plaintiffs' allegations of Liggett's policymaking inadequacies fall into three categories: (1) the failure to follow accepted standards for the basic structure and staffing of juvenile residential facilities; (2) the failure to properly train staff to recognize child abuse; and (3) the promulgation of de facto policies and the failure to implement other policies, ultimately leading to the stifling of complaints of abuse and incompetent investigations of the complaints that were made. The plaintif fs' expert, John Cocoros (a consultant with extensive experience in the field of residential facilities for delinquent youths), opined in a written report prepared for the plaintiffs that these deficiencies created a situation in which YDC failed to have "basic precepts of institutional management without which no administrator can claim to operate a facility which provides safety and security for its staf f and residents," thus "unnecessarily plac[ing] juveniles at high risk for abuse at the hands of staff " and "cr eating an environment in which eventual abuse was virtually predictable."

Regarding the first area of allegedly deficient policymaking by Liggett, the plaintiffs point to five inadequacies with the basic structure of YDC: (1) YDC did

not require that a female staff member be present at all times in the female units, in contravention of the American Correctional Association's Standards for Juvenile Training Schools No. 3-JTS-3A-07; (2) there was poor or nonexistent supervision of the staff at night (when Whetzel committed many of his abuses); (3) YDC had no observation or surveillance system (thus ensuring that Whetzel could take female residents to areas where they would be unobserved); (4) YDC permitted private, unsupervised interactions between male staff and female residents; and (5) YDC permitted unsupervised trips off-gr ounds by female residents solely accompanied by male staf f.

With respect to the failure of staf f training, the plaintiffs contend that, despite rules that requir ed and staff training

that emphasized that all allegations of abuse be r eported, Liggett allowed staff members to decide on their own whether to report an allegation. Because the allegations against Whetzel were reported to dif ferent staff members, many of whom did not report those allegations to Liggett, no one person knew the extent of the allegations against Whetzel. In their brief, the plaintiffs list seven different employees who were aware of differ ent allegations against Whetzel but who did not report these allegations to Liggett. See Pls.' Br. at 24 n.8. The plaintif fs argue that Liggett's failure to have any sort of review pr ocedure in place to determine whether the notification policy was being followed, along with his failure to discipline these employees after this information came out or to train them properly in the first place, were serious policy deficiencies that, according to Cocoros, led to the cr eation of a staff subculture in which a staff member's abuses could go unaddressed.

Finally, the plaintiffs assert that Liggett's policies failed to provide the juveniles under his care with multiple and easily accessible opportunities for them to r eport abuse. They contend that any reports of abuse that wer e made were incompetently investigated under Liggett's overall supervision. According to the plaintiffs, Liggett's policies allowed his staff to respond to initial allegations with threats (Robinson, Whetzel) and confrontation (Earnhart). When a report did reach Liggett, he is alleged either to have failed to initiate an investigation (as with Jocheded Good's allegation),9 or to have initiated inadequate investigations (as with the two Tate allegations, both of which were determined by YDC to be unfounded although the

_____

9. At one point in their brief, the plaintif fs claim that Liggett knew about
Good's allegation, but in another section they assert that Flecher failed
to notify Liggett of Good's allegation. See Pls.' Br. at 24, 32. The
implication of the plaintiffs' claim that Flecher did not inform Liggett of
the allegation is that Flecher knew of the allegation but Liggett did not;
thus, the plaintiffs' claims here may be inconsistent. Because we must
draw all inferences in favor of the non-moving party in a review of a
summary judgment motion, we conclude for the purposes of this appeal
that Flecher did not inform Liggett of Good's allegation but that Liggett
learned of it through some other means.

Pennsylvania state police determined them to be true in its
investigation).

Because we are reviewing the District Court's grant of
summary judgment, we take the above allegations to be
true and we must now consider whether they ar e legally
sufficient to support a claim of deliberate indif ference past
the summary judgment stage. More specifically, the
relevant issue is whether the above-described policymaking
inadequacies raise a genuine issue of material fact as to
whether the four-part test for deliberate indifference from
Sample is met. As we noted above, Sample provides two
methods of meeting this test: (i) showing that the
supervisor failed to adequately respond to a pattern of past
occurrences of injuries like the plaintif fs', or (ii) showing
that the risk of constitutionally cognizable har m was "so
great and so obvious that the risk and the failure of
supervisory officials to respond will alone" support finding
that the four-part test is met. Sample v. Diecks, 885 F.2d
1099, 1118 (3d Cir. 1989).

We conclude that the plaintiffs have not met their burden
of showing the existence of a genuine issue of material fact
as to whether Liggett exhibited deliberate indif ference in his
policymaking. Considering the first method of meeting the
Sample test, the plaintiffs have not shown that Liggett was
aware of a "pattern" of sexual assaults being committed by
YDC employees. See id. At most, they have alleged that
Liggett was aware of Good's allegation and that he was
aware of two allegations regarding T ate. Such knowledge
cannot benefit Beers-Capitol in her claim against Liggett
because the behavior described in the allegations occurred
after her abuse, and a successful deliberate indif ference
claim requires showing that the defendant knew of the risk
to the plaintiff before the plaintiff 's injury occurred. See
Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997)
(holding that a plaintiff cannot make out a deliberate

indifference claim against prison officials for a prison attack when the plaintiff presented evidence that the defendants knew of the attack afterwards but presented no evidence that defendants knew of the risk to the defendant before the attack). Because Whetzel's abuse of Beers-Capitol occurred approximately eight months befor e Whetzel's

22

abuse of Tate, some evidence of the defendants' awareness of Whetzel's activities is available to Tate but not Beers-Capitol.

Tate could argue that Liggett knew of Good's allegation and her first allegation before her final abuse had occurred, but we do not believe that two allegations constitute a "pattern of past occurrences" as contemplated by Sample. Furthermore, even if two instances is a pattern, this is not a pattern of known injuries, but a pattern of known allegations, which is quite differ ent; they are known to be injuries now, but it is what Liggett knew at the time, not what he knows now, that is material.

The plaintiffs concentrate their argument on the second method of meeting the Sample test--the existence of "so great and so obvious" a risk, which is alleged to have arisen as a result of deficient policies and practices that were in place before the attacks on Beers-Capitol. T o make their argument, the plaintiffs point to Cocor os's conclusion that YDC's administration showed "reckless disr egard for the safety of residents." This conclusion is suf fused with legal considerations, and it is our province to deter mine whether the factual conclusions in Cocoros's report support the legal conclusion of deliberate indiffer ence. The report shows that YDC did not implement a number of policies that were standard or recommended in the juvenile detention field, and that YDC's policies and procedures could have been better. We note in passing that the r eport, if accurate, is an indictment of the administration of the YDC by Liggett and the Pennsylvania Department of Public Welfar e. Most importantly, the plaintiffs argue for cefully that Liggett's policymaking created an "institutional mindset" that allowed Whetzel's abuse to go on for as long as it did.

The deliberate indifference standar d as set out in Farmer is a high one, however--requiring actual knowledge or awareness on the part of the defendant--and the plaintiffs' evidence here is not sufficient to cr eate a genuine issue of material fact as to whether the above policies and practices created a risk of harm to the plaintif fs that was "so great and so obvious" that Liggett must have known of the excessive risk but was indifferent to it. Although Cocoros's

report does seem to raise a genuine issue as to Liggett's

negligence, it is not "evidence from which it can be inferred" that Liggett "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." Farmer, 511 U.S. at 846; see also Steele v. Choi, 82 F.3d 175, 179 (7th Cir. 1996) (holding that evidence that a minimally competent doctor would have treated the plaintiff prisoner correctly while the defendant doctor did not is insufficient under Farmer to survive the defendant's motion for summary judgment in a deliberate indifference case).

As we have explained, using circumstantial evidence to prove deliberate indifference r equires more than evidence that the defendants should have recognized the excessive risk and responded to it; it requir es evidence that the defendant must have recognized the excessive risk and ignored it. The plaintiff 's evidence may raise an issue of material fact as to the former but it does not for the latter. We therefore will affirm the District Court's grant of summary judgment for Liggett.

2. Charles Earnhart, Director of Unit 7

Earnhart was the unit director of Unit 7 during the relevant time period, responsible for the day-to-day operations of Unit 7, which included supervising the staff of the unit and reviewing and evaluating r eports and scheduled work. Earnhart directly supervised the unit managers, meeting with these managers daily.

The plaintiffs' deliberate indiffer ence claims against Earnhart involve a combination of direct and supervisor liability. First, the plaintiffs assert that Earnhart participated in formulating and implementing the policy that allowed the night shift in the female r esidents' unit to be without a female staff member, as well as the policy permitting unsupervised male staff to take female residents off-grounds. The analysis of this claim of deliberate indifference proceeds along the same lines as outlined above for Liggett (with the four-part test fr om Sample), but this supervisory-based claim is weaker than the one against Liggett that we rejected above. As to whether Earnhart was aware of a pattern of past injuries, the facts as alleged only support the conclusion that he knew of Beers-Capitol's

allegation, and one incident does not a patter n make. As to the "so great and so obvious a risk" method of meeting Sample's test, the analysis begins and ends just as it did for Liggett. In fact, because Earnhart's supervisory responsibility at YDC was not as great as Liggett's, there is less evidence that Earnhart's policies cr eated a risk that was "so great and so obvious" that he must have known of the excessive risk but was indifferent to it. For these reasons, the plaintiffs' claims of deliberate indifference against Earnhart based on supervisor liability cannot survive summary judgment.

The plaintiffs also submit that Earnhart directly exhibited deliberate indifference to the plaintiffs' injuries through two other actions: (1) by failing to discipline Robinson for delaying her reporting of Beers-Capitol's allegation of abuse; and (2) by mishandling Beers-Capitol's allegation, in that (a) Earnhart did not r eport it to Liggett (as required by law); and (b) Earnhart "undertook a wholly inadequate investigation," namely, merely calling Beers-Capitol at home and asking her over the phone if the abuse occurred.10

We note first that Beers-Capitol cannot use the above two actions to support her claim that Earnhart was aware of the risk of abuse to her because these actions took place after Beers-Capitol's abuse. In the absence of any other evidence that Earnhart was aware of an excessive risk to Beers-Capitol, Beers-Capitol cannot make out a dir ect deliberate indifference claim against Ear nhart. See Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997).

However, Tate can claim that Ear nhart's actions surrounding Beers-Capitol's abuse (which occurr ed before the abuse Tate suffered) ar e evidence that, by the time of Tate's abuse, Earnhart was aware of but ignored the excessive risk to the female residents posed by Whetzel. We nonetheless conclude that this evidence is insufficient to create a genuine issue of material fact as to whether Earnhart was deliberately indiffer ent. It is not apparent

_____

10. Although it is unclear from the r ecord whether Earnhart called Beers-Capitol himself or had Flecher call Beers-Capitol, see supra page 8 & note 4, this does not affect our analysis.

25

how Earnhart's failure to discipline Robinson for her brief delay in reporting Beers-Capitol's allegation demonstrates that Earnhart was deliberately indiffer ent to a risk to Tate. Furthermore, although Earnhart pr obably should have

better handled the investigation into Beers-Capitol's allegation, this lapse is not nearly enough to clear the high bar set by Farmer: raising an infer ence that he "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." Farmer, 511 U.S. at 846. We therefore will affirm the District Court's grant of summary judgment for Earnhart.

3. Joseph Flecher, Manager of Unit 7

Flecher was the unit manager for Unit 7 during the relevant time period. Unit managers are r esponsible for developing, coordinating, and administering pr ogram services for their unit; they also directly supervise the cottage supervisors within their unit. As with Ear nhart, the plaintiffs' claims of Flecher's deliberate indifference combine direct and supervisor liability. First, the plaintiffs claim that Flecher failed to adequately train the staff under him to recognize abuse. Second (and relatedly), plaintiffs assert that Flecher carried out a de facto policy of failing to notify Liggett of allegations of abuse and of disbelieving such allegations when they were presented to him, because, as Flecher stated to Investigator McLean, "these types of accusations occur on a frequent basis when female students become upset or angry with staff members." The plaintiffs also have presented evidence that supports a claim of direct liability against Flecher , namely that, in the time period before Tate's abuse but after Beers-Capitol's, Flecher had notice of, but did not adequately r espond to, Whetzel's abusive activities.11  The evidence is: (1) Flecher's failure to notify Liggett of Beers-Capitol's allegations; (2) Flecher's failure to notify Liggett of Good's allegations; (3) Flecher's failure to notify Liggett of McAfee's allegations; (4) Flecher's failure to make any recor ding of McAfee's

_____

11. As above, this evidence only supports T ate's claim against Flecher, not Beers-Capitol's, because all of these actions occurred after Beers-Capitol's abuse.

26

allegations; and (5) Flecher's failure to conduct adequate investigations of Beers-Capitol's, McAfee's, and Good's allegations.

Of the three supervisor defendants (Liggett, Earnhart, and Flecher), Flecher appears to be the one who had the most information about what was going on with Whetzel. Furthermore, because he was the manager of Unit 7, Flecher was in a position both to conduct investigations into Whetzel's behavior and to inform Liggett of any

problems and allegations regarding Whetzel. The plaintiffs argue that the combination of Flecher's knowledge of the allegations against Whetzel, Flecher's failur e to follow YDC procedures and Pennsylvania law in not notifying Liggett of these allegations, and Flecher's own inadequate investigations of the allegations together cr eate a genuine issue of fact as to Flecher's deliberate indif ference. Although there is no direct evidence that Flecher was aware of Whetzel's activities, the plaintiffs contend that Flecher had heard enough allegations against Whetzel and knew enough about the inadequate system for addressing those allegations that he must have known of the excessive risk of harm to the plaintiffs.

While this issue is a close one, we conclude that the plaintiffs' evidence does not create a genuine issue of fact as to Flecher's deliberate indifference. The plaintiffs have provided evidence that Flecher was awar e of three allegations of abuse by Whetzel, but there is no evidence that Flecher believed that these allegations wer e likely to be true, or that the evidence surrounding the allegations was so strong that he must have believed them likely to be true. In fact, the plaintiffs have presented evidence that Flecher disbelieved the allegations: his statement to McLean that "these types of accusations occur on a fr equent basis when female students become upset or angry with staf f members." See supra note 3. This statement is illuminating of Flecher's subjective mindset of basic skepticism regarding the allegations raised by the female YDC residents; although this mindset does not comport well with YDC's official policies and Pennsylvania law, it is also inconsistent with the subjective knowledge of a risk required for deliberate indiffer ence under Farmer.

27

The plaintiffs here have failed to pr esent the kind of evidence that successful plaintiffs have pr esented in deliberate indifference cases after Farmer: evidence that directly shows that Flecher either knew of the excessive risk to the plaintiffs or was aware of such overwhelming evidence that he had to know of such a risk. The case is thus different from Hamilton v. Leavy, 117 F.3d 742 (3d Cir. 1997), where we reversed the grant of summary judgment in a deliberate indifference case for a prison official defendant who was in charge of prison transfers. The plaintiff in Hamilton presented evidence that, before the attack, the defendant had received a recommendation that the plaintiff be placed in protective custody because of his risk of being attacked, the defendant knew that the plaintiff was more likely to be attacked because he was a prison informant, and the defendant had approved putting the

plaintiff in protective custody on two pr evious occasions.12 The plaintiffs' evidence against Flecher falls well below this level.

Flecher investigated McAfee's allegation, and either he or Earnhart investigated Beers-Capitol's allegation (the record is not clear what happened with Good's allegation). Although these investigations may have been inadequate, we do not review the adequacy of a defendant's response to an excessive risk to inmate safety in a deliberate indifference case until the plaintif f has established that the defendant knew or was aware of that risk. See Farmer, 511 U.S. at 844. The performance of a less-than-thorough investigation of a risk does not show that the investigator

_____

12. See also Spruce v. Sargent, 149F.3d 783 (8th Cir. 1998) (reversing district court's judgment as a matter of law for one defendant in a deliberate indifference case because the plaintiff-prisoner presented documents signed by that defendant which contained numerous references to sexual attacks the plaintif f was suffering, but affirming judgment for another defendant because the plaintif f did not present similar evidence as to that defendant); Pavlick v. Mifflin, 90 F.3d 205 (7th Cir. 1996) (affirming entry of judgment for the plaintiff-prisoner in deliberate indifference case because the plaintiff presented evidence that, moments before he was attacked while sleeping in his cell by prison gang members who had a grudge against him, the defendant, a prison guard, was outside plaintiff 's cell talking with these gang members, and then the defendant unlocked the door to plaintiff 's cell and walked away).

28

believed that the excessive risk existed--indeed, it may show the opposite. Finally, Flecher's failur e to notify Liggett of these allegations is evidence of negligence in the performance of his job, but it does nothing to support the claim that he knew or must have known of the excessive risk to the plaintiffs.

The most that the plaintiffs show is that Flecher followed a set of de facto rules and policies that involved his deciding on his own whether and how to investigate certain allegations of abuse, in violation of YDC policy and Pennsylvania law. While this course of action was imprudent, and in fact led to a very regr ettable outcome, it does not constitute deliberate indiffer ence as the Supreme Court defined that concept in Farmer. Moreover, the plaintiffs have presented no other evidence that shows that Flecher was subjectively aware of the excessive risk to the plaintiffs. The plaintiffs have thus failed to raise a genuine

issue of fact as to the existence of deliberate indifference on the part of Flecher, and we will affir m the District Court's grant of summary judgment in his favor.

4. Nora Burley, Counselor in Unit 7

Burley worked in Unit 7 as a counselor; her job was to provide security in the unit and monitor r esident interactions. The plaintiffs' deliberate indif ference claims against Burley center solely on direct liability, as Burley was not a supervisor. The plaintiffs pr esent fairly substantial evidence of Burley's knowledge or awar eness of the excessive risk that Whetzel posed to the female residents. Burley testified in a deposition that, while she was at YDC, she had heard general rumors fr om the residents that Whetzel was having sex with some of the female residents, but she did not investigate these rumors or report them to her supervisors. She did, however, make file notes of these rumors "[t]o cover my behind, in case it were true."

Burley was also told on a couple of occasions that Guyaux claimed to have a sexual relationship with Whetzel. Burley did not inform her supervisors of this allegation, but instead set up a meeting with Whetzel, Guyaux, and

29

another counselor to ask Guyaux about it.13 Burley also testified that she knew McAfee had a sexual inter est in Whetzel, although she did not report or investigate this. Finally, and most tellingly, Tate testified in her deposition that Burley admitted to her that "she kind of knew that [Whetzel] was messing with students" when T ate told Burley of Whetzel's assault on her.14 [1532a, Tate Dep.]

We are satisfied that the plaintif fs have presented sufficient evidence to raise a genuine issue of material fact as to Burley's deliberate indifference to the excessive risk Whetzel posed to the plaintiffs. Burley's statement to Tate that she "kind of knew" that Whetzel was "messing" with students is significant evidence that Burley was"aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that she "also dr[ew] the inference." Farmer, 511 U.S. at 837. The other evidence about what Burley knew strengthens this conclusion. Moreover, the fact that Burley said to Tate that she did not know that Whetzel was "messing" with Tate in particular does not constitute a defense to a deliberate indifference claim; Farmer is clear that a defendant need not know that the particular inmate attacked was at risk, as it is enough for deliberate indiffer ence if a defendant

knows that inmates in the plaintiff 's situation face such a risk. See id. at 843-44.

For the purposes of reviewing a grant of summary judgment for the defendants, Burley basically admitted that she had knowledge of Whetzel's abusive activities by the time of Tate's abuse in her statement to T ate. The difficulty for Beers-Capitol is that this admission was made in January 1995, approximately ten months after Beers-Capitol was abused, and Beers-Capitol must show that Burley knew of the risk Whetzel posed before he abused Beers-Capitol. See Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997). However, even though the abuse of Beers-

_____

13. This was the meeting to which Whetzel br ought Guyaux, threatening her en route.

14. Tate's recounting of Burley's comment is admissible evidence because, as an admission by a party-opponent, it is not hearsay under the Federal Rules of Evidence. See Fed. R. Evid. 801(d)(2).

Capitol occurred before Burley made her admission to Tate, we think that the evidence presented by the plaintiffs raises a genuine issue of fact as to what Burley was awar e of regarding Whetzel at the time Beers-Capitol was abused.

Burley's awareness of Whetzel's activities had to have been based upon some information she r eceived before she made her admission to Tate in January 1995. Burley admitted in her deposition that, during her time at YDC, she heard various rumors that Whetzel was having sex with female residents, and she made file notes of these rumors, "[t]o cover my behind, in case it wer e true." Because we draw all inferences in the non-movant's favor in our review of a summary judgment motion, we conclude that these rumors formed at least part of the basis for her awareness of Whetzel's activities. Burley had started to hear these rumors at least by March 1993 (a full year before Beers-Capitol was abused), when she set up a meeting with Whetzel and Melissa Guyaux to investigate rumors that Whetzel and Guyaux were having sex. Thus, Beers-Capitol has shown that Burley received at least some of the information that formed the basis for her awareness before Beers-Capitol was abused.

The short of it is that, drawing all inferences in Beers-Capitol's favor, it is possible that Burley r eceived enough information about Whetzel's activities that she formed her awareness of these activities by March 1994, when Beers-

Caitol was abused. This creates a genuine issue of fact as to what Burley knew when, and the evidence pr esented could support a conclusion by the factfinder that Burley's awareness arose before March 1994. Under this circumstance, the evidence presented r egarding Burley is sufficient to get both Tate and Beers-Capitol past summary judgment. We will thus reverse the grant of summary judgment for Burley on both plaintiffs' claims.15

_____

15. As we noted earlier, the defendants also assert qualified immunity; the District Court did not reach this issue because it granted summary judgment to the defendants on the merits. While it is not necessary for us to decide this claim as to the other defendants because we will affirm the summary judgment grants for them, it is a live issue as it relates to Burley. The qualified immunity argument fails, however, because, to the

5. Shirley Robinson, Youth Development Aide in Unit 7

As a youth development aide, Robinson perfor med a role that was similar to a YDC counselor's: providing security in

_____

extent that the plaintiffs have made a showing sufficient to overcome summary judgment on the merits, they have also made a showing sufficient to overcome any claim to qualified immunity.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, (1982). It is the defendants' burden to establish that they are entitled to
such immunity. See Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989). That is, the defendants must show that their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Unlike Farmer's subjective test of what the prison official knew, the test for qualified immunity is objective. "Under the test
announced in Harlow, reasonableness is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant." Stoneking, 882 F.2d at 726 (citing Anderson v. Creighton, 483 U.S. at 641). That is, Burley is entitled to qualified immunity only if she
can show that a reasonable person in her position at the relevant time

could have believed, in light of clearly established law, that her conduct comported with established legal standards. See id.

There is no question that the plaintiffs' constitutional right that was violated--the right not to be sexually abused by a state employee while in confinement--was clearly established at the time of Burley's relevant actions. See Farmer, 511 U.S. at 833-34; Estelle v. Gamble, 429 U.S. 97, 102-03 (1976); Stoneking, 882 F.3d at 726. The doctrine of deliberate indifference was also clearly established at the relevant time. See Estelle,
429 U.S. at 104-05. The key issue for our purposes is whether Burley's relevant conduct was objectively reasonable, or, more specifically, whether a reasonable YDC worker in her situation could have believed that her conduct comported with established legal standards, i.e., she was not being deliberately indifferent to the existence of an excessive risk to the plaintiffs (either because she thought that there was no excessive risk or because she thought that her r esponse was adequate). We have determined, however, that the plaintiffs have raised a genuine

the units and monitoring resident interactions. As with Burley, the plaintiffs' claims against Robinson involve only direct liability. The plaintiffs pr offer the following two acts as evidence of Robinson's deliberate indiffer ence: (1) when Beers-Capitol told Robinson that Whetzel impr egnated her, Robinson's first response was to say, "W ell, you know you can get in trouble making accusations like that,"; and (2) Robinson delayed reporting Beers-Capitol's allegation to her supervisor (although it is unclear from the r ecord exactly how long this delay was, as Robinson's and Ear nhart's testimony differ on this point). Because these actions by Robinson occurred after Beers-Capitol's abuse, and the plaintiffs present no evidence regar ding Robinson's awareness of Whetzel's activities befor e that abuse, Beers-Capitol has presented no evidence to support her deliberate indifference claim against Robinson. See Lewis v. Richards, 107 F.3d 549, 553 (7th Cir. 1997). T ate, however, has a potential direct deliberate indiffer ence claim against Robinson, as her abuse occurred after Robinson's actions, and Tate can argue that these actions ar e evidence that, by the time of Tate's abuse, Robinson was awar e of the risk Whetzel posed to the female residents but was indifferent to this risk.

Nevertheless, we conclude that the above-described evidence is an insufficient basis for inferring that Robinson

_____

issue of material fact as to whether Burley was deliberately indifferent. Because deliberate indifference underFarmer requires actual knowledge or awareness on the part of the defendant, a defendant cannot have

qualified immunity if she was deliberately indif ferent; a reasonable YDC worker could not believe that her actions comported with clearly established law while also believing that ther e is an excessive risk to the plaintiffs and failing to adequately r espond to that risk. Conduct that is deliberately indifferent to an excessive risk to YDC residents cannot be objectively reasonable conduct. See Carter v. City of Philadelphia, 181 F.3d 339, 356 (3d Cir. 1999) (holding that, if the plaintiff succeeds in establishing that the defendants acted with deliberate indifference to constitutional rights, then a fortiori the defendants' conduct was not objectively reasonable, and hence the defense of qualified immunity would not be available to defendants). Because ther e is a genuine issue of fact as to whether Burley was deliberately indif ferent, she has not carried her burden to establish that she is entitled to such immunity. We thus reject Burley's qualified immunity claim.

"knowingly and unreasonably disregar d[ed] an objectively intolerable risk of harm." Farmer , 511 U.S. at 846. The plaintiffs' evidence contains only a single instance where Robinson was informed of an allegation against Whetzel. Moreover, she did report this allegation to her supervisor (albeit after a short delay). While Robinson's r esponse to the allegation--telling Beers-Capitol that "you can get in trouble making allegations like that"--was certainly inappropriate given her responsibilities as a youth development aide, this impropriety is not enough to show deliberate indifference. Furthermore, Robinson did report the allegation to her supervisor, which was a reasonable r esponse. Although Robinson delayed her report somewhat, this minor delay surely had little or no effect on Whetzel's risk to Tate, who was not yet at YDC at the time of Beers-Capitol's allegation.

The most that Tate can claim is that Robinson's original response to Beers-Capitol and her delay in r eporting the allegation made Beers-Capitol less likely to continue to maintain her allegation when later questioned. As with Flecher, however, such evidence goes to the adequacy of Robinson's response to the risk, and we do not reach that question until we determine that there is a genuine issue of as to Robinson's awareness of the risk. One allegation, later denied, is not sufficient evidence for us to infer that Robinson knew or must have known of the risk to T ate. We therefore affirm the grant of summary judgment for Robinson.

Conclusion

For the foregoing reasons, we will affir m the District Court's grant of summary judgment as to the defendants

Liggett, Earnhart, Flecher, and Robinson, and reverse the grant of summary judgment for Burley. The case will be remanded to the District Court for further pr oceedings consistent with this opinion. Parties to bear their own costs.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit